PAPOT, surviving partner, *vs.* THE SOUTHWESTERN RAILROAD *et al.*

1. The admission of the testimony of Papot in respect to interest accumulated on the shares of the capital stock of the Vicksburg and Brunswick Railroad Company, transferred to the defendants by Shorter, Papot & Company, if objectionable, as irrelevant, is not so material as to require a new trial.

(*a.*) *Semble,* that such evidence was relevant, inasmuch as those shares were the consideration given by the firm for the shares of the Southwestern Railroad Company, for a remainder of which, alleged to be due them by the company, the suit was brought.

2. There was no error in permitting proof that the Central Railroad directed an examination into the status of the Vicksburg and Brunswick Railroad Company, in respect to its general condition, indebtedness, etc., one issue being that Shorter, Papot & Company, by fraudulent misrepresentations, or suppressions of truth in respect to the true condition of that road, had defrauded defendant.

3. The pencil memoranda of Virgil Powers at the foot of a letter of Ketchum & Hartridge to Holt, as to what he might report to Ketchum & Hartridge, were properly ruled out, as neither Shorter, Papot & Company nor Ketchum & Hartridge knew of them. Besides, if admitted, the memoranda amounted to nothing.

4. The record of a marshal's deed recorded in Alabama is not proof of the deed in the courts of this state, so as to admit it in evidence without proof of execution.

5. When read in connection with the entire charge, there was no error in the charge complained of in the fifth ground of the motion for a new trial, as to whether the consideration of the contract under review was the payment of interest or the turning over of the Vicksburg and Brunswick Railroad to the Southwestern Railroad Company.

6. When read in connection with the entire charge, there was no error in that portion of the charge contained in the sixth ground, on the subject of the knowledge of the president of the Central Railroad concerning the debts and liabilities of the railroad of which it was desired to get possession.

7. When taken alone, the charge to the effect that, if the counsel of

the Central Railroad reported that there were no debts or liabilities, and the company relied on their report of what turned out to be false, although Papot, who knew better, represented the same thing, yet the company would be bound by the misinformation of counsel as between itself and Papot, would be error, but the record is confused as to what this charge really was, the ground of the motion for new trial and the general charge differing; but, construing the charge together, it instructed the jury, in effect, correctly, that, if Papot had made no representations and suppressed no facts which tended to induce the president of the Central Railroad to make the contract, and if the latter acted entirely free from any such fraud, open or concealed, on the part of Papot, then Papot might recover; but if the president was influenced by the conduct of Papot, or any of his company, to believe that the Vicksburg and Brunswick Railroad Company was not in debt, when Papot knew it was, then he could not recover.

8. While the charge complained of in the eighth ground of the motion might have been more plainly put, yet, in effect, it correctly charged that knowledge of the agent about business entrusted to him by the principal, acquired by reason of the employment, is knowledge of the principal; but if he was also at the same time an officer of the company about whose condition he was employed to make inquiry, then his knowledge was not the knowledge of the company employing him; and such charge could not have injured the Central Railroad.

9. Although a request to charge may have been good law and applicable to the case, yet where it is substantially covered by the whole tenor of the general charge, its refusal will not require a new trial.

10. A request to charge that, if the defendants made the contract under consideration for the purpose of obtaining the use and control of the road from Eufaula to Clayton, Alabama, and paid the full and fair value for such property, or agreed to do so, and they have lost the expected benefits of such contract by reason of outstanding debts against said property at the time, of which they were ignorant, then the complainant could not recover, even though any part of the consideration agreed to be given had not been paid, was too broad. It ignored the necessity for the participation of Shorter, Papot & Company in causing this ignorance, or whether they knew the purpose of the defendants, or whether it was a part of the contract.

11. There was sufficient evidence to support the verdict, and this being the third verdict, and no error of law appearing to require a new trial, its grant was error.

February 7, '85.

Evidence. Notice. Fraud. Deeds. Registration. Charge of Court. Contracts. Consideration. Principal and Agent. New Trial. Practice in Supreme Court. Before Judge SIMMONS. Bibb Superior Court. April Term, 1884.

This case has been twice before the Supreme Court, and will be found reported in 59 *Ga.*, 343, and 67 *Id.*, 675. On the last trial, the jury found for the plaintiff $2,067.10, principal, with interest from May 1, 1872. Defendants moved for a new trial, on numerous grounds, all of which are sufficiently set out in the divisions of the decision where they are considered, except the following:

(1.) Because the court erred in permitting S. N. Papot, when being examined as a witness in said case, to testify, over the objection of defendants, that there was about $60,000.00 (sixty thousand dollars) accumulated interest on the four thousand four hundred shares capital stock Vicksburg and Brunswick Railroad Company, transferred by Shorter, Papot & Company to Central Railroad, at the time of said transfer.

(2.) The court erred in permitting said Papot to testify, over the objection of defendants, as to the direction given by the board of directors of the Central Railroad and Banking Company of Georgia that General Lawton and Eli S. Shorter should look into the affairs of the road and report, etc.

(3.) Because the court erred in ruling out the pencil memoranda made by Virgil Powers at the foot of the letter of Ketchum & Hartridge to S. W. Holt, president, of the 14th of May, 1872, to-wit:

" You can say I have matter under investigation, and will report amount due as soon as practicable.        V. POWERS, *Supt.*"

" Please return to me with my answer per K. & H. Have directed J. M. Waldren, road master, to make return to me of the cost of completing the work left unfinished; when he reports, I will give you statement of settlement.        V. POWERS, *Supt.*"

(4.) Because the court erred in ruling out the deed

from the marshal of the United States, for the state of Alabama, to W. M. Wadley, for the Vicksburg and Brunswick Railroad, and all its appurtenances and property, on the 9th day of April, 1883, and not allowing it to be read in evidence, when offered in evidence by defendants, the court ruling it on the ground that defendants had not proved its execution, and that its being recorded in the proper office, under the laws of the state of Alabama, did not dispense with proof of execution.

The court granted a new trial, and the plaintiff excepted. The entire charge of the court was as follows:

GENTLEMEN OF THE JURY: This is a bill filed by Shorter, Papot & Co. against the Southwestern Railroad Company, wherein they allege that, on the 28th of November, 1871, they made a contract with said Southwestern Railroad Company, whereby they agreed with said company to finish the work on the Vicksburg and Brunswick Railroad from Eufaula to Clayton, in the state of Alabama. They were to do certain work on said railroad in the way of covering bridges, fixing road-bed, building warehouse, and other things, and when they had finished the road in such manner as to meet the approval of Mr. Powers, superintendent, they would then transfer and deliver to the defendant, the Southwestern Railroad Company, four thousand four hundred shares of the preferred eight per cent stock of the Vicksburg and Brunswick Railroad Company of the par value of $100.00 per share, at the rate of one hundred and fifty shares per mile of road finished to Clayton.

Complainants further allege that, in pursuance of the contract so made with the defendant, they constructed a fraction over twenty-one miles of railroad, completing said Vicksburg and Brunswick Railroad to Clayton, and in every particular complied with the terms of their contract; and that all was approved by Mr. Powers, and that they transferred to the Southwestern Railroad Company four thousand four hundred shares of the stock of the Vicksburg and Brunswick Railroad Company, as required by their contract. They further allege that the number of shares that they were entitled to receive under said contract was three thousand one hundred and seventy, but that the defendant, the Southwestern Railroad Company, had only transferred to them three thousand one hundred and seventeen shares, valued at $311,700.00, and that said defendant is still due them, under their contract, fifty-three shares, of the value of $5,300.00. Since filing their bill, they have agreed to Mr. Powers' measurements of the road, and only claim now forty-six (46) shares,

of the value of $4,600.00. These are the allegations of the complainants in their bill.

The defendant, the Southwestern Railroad Company, and the Central Railroad Company, having made itself a party, answer the bill filed by complainants, and admit the making the contract as set out in the bill, but deny that they are indebted to complainants in any manner or in any amount. They say that it is true that Papot & Co. finished twenty-one miles and a fraction of the railroad; that they were entitled to, or would have been entitled to, three hundred and sixteen and ninety-eight one hundredths shares of the Southwestern Railroad stock, of the value of $316,298.00, had they waited till the completion of their contract, but that said Papot & Co., by reason of their embarrassments and necessities, induced them, the defendants, to advance to said firm of Papot & Co. a large portion of said stock long before the completion of the contract, on condition that said firm would allow said defendant interest at the rate of eight per cent per annum from the time the advances were made to the completion of the contract; that in pursuance of this last arrangement with Papot & Co., they advanced to divers persons, on the orders of Papot & Co., on the 1st day of February, 1872, two thousand nine hundred and five shares of their stock, of the par value of $290,500.00, and that on the 1st of April, 1872, they advanced two hundred shares, of the par value of $20,000.00, and on the 15th of May shares of the value of $1,200.00, making in all three thousand one hundred and seventeen shares, of the par value of $311,700.00, on which was due for interest, according to agreement, $4,526.65, making in all $376,-226.20, leaving due said firm a balance of $71.47, which balance was allowed them by Papot & Co. for some unfinished work. Defendants therefore say that Papot & Co. have been fully paid all that they were entitled to receive under said contract.

Defendants further claim, in their amended answer and cross-bill, that the agreement to pay Papot & Co. one hundred and fifty shares for each mile of the Vicksburg and Brunswick Railroad, when finished to Clayton, was made by them solely to secure control of said Vicksburg and Brunswick Railroad, and to run it at their will and discretion in connection with the Southwestern Railroad, which was then, and is now, connected, free from all incumbrances and debts whatsoever; that the four thousand four hundred shares of the stock of the Vicksburg and Brunswick Railroad was a majority of the stock of said road, and its ownership enabled the defendants to control said road; that Papot & Co., to induce defendants to make said contract, assured them that said Vicksburg and Brunswick Railroad was absolutely free from all debts, and subject to no claims or liabilities, and on the faith of these representations, the contract was made, and the stock of the Southwestern Railroad delivered. Defendants allege said representations were false, and say that said Vicksburg and

Brunswick Railroad had endorsed bonds issued by Barbour county, given for stock in said road, to the amount of $300,000.00, and delivered them to Papot & Co., who put them in circulation; that Barbour county failed to pay interest on said bonds, and suits were brought thereon against the Vicksburg and Brunswick Railroad on its endorsement, and judgments obtained, the road levied on by the United States marshal and sold.

Papot & Co. reply to this part of the answer and cross-bill, and say that, at the time of the agreement or contract, nothing was said about the endorsement of the Barbour county bonds, nor did he, to the best of his recollection, say the Vicksburg and Brunswick Railroad was free from all debts and liabilities.

These are the pleadings as set up in the bill and the answer of the parties, and they constitute the issue for the jury to pass upon under the law, as I will give it to you in charge, and the testimony in the case: The pleadings, I say, are not evidence before the jury. The allegations that Mr. Papot makes he must sustain by the evidence. The allegations in the answer, which the railroad makes, must be sustained by proof, and the jury must find what is the truth from the testimony in the case. You will, therefore, see that the great contention in this case is about the shares of stock,—Papot & Co. claiming, on the one side, that they have fully carried out their contract which they made with the Railroad Company, in November, 1871, and that the Railroad Company refused to pay the balance which they owe, and which they claim to be forty-six shares.

The Central Railroad denies that, and says that they have fully offered, or at least set up, two defenses. One is, that it was paid off by issuing so much stock, and the interest on that stock, which they claim by a subsequent agreement they made with Papot & Co.; and, secondly, that they bought the road solely in order to obtain control over a road, so that nobody else could have it, on the assurance of Papot & Co. that there were no debts or liabilities against the Vicksburg and Brunswick Railroad, and they say that assurance was false, that it was subsequently sold for debts owed at that time. The Central Railroad don't claim, mind you, that they paid three thousand one hundred and seventy shares in stock. They claim that they have paid either in stock, money or interest, which amounts to that much. That is for you to find, under the law and the testimony, whether they owe Papot & Co. anything now or not, or whether it is fully paid.

Well, upon the first theory of this defence, I charge you this, that the true construction of the contract made on the 28th of November, 1871, by Papot & Co. and the Southwestern Railroad Company, is this: That Papot & Co. were to receive from the Southwestern Railroad Company one hundred and fifty shares of its stock for every mile completed between Eufaula and Clayton, and that stock

to be par value. For every mile completed they were entitled to one hundred and fifty shares of stock, at par value, at $15,000.00. That is the true meaning of that; and if you believe, from the evidence in the case, that subsequently to the time that this contract was made, in November, 1871, that, on account of the embarrassment or necessities of Papot & Co., they induced the Southwestern Railroad Company, or the Central Railroad Company, to make another contract, whereby they were to issue this stock sooner than the time contemplated in the first contract, and that Papot & Co. agreed to pay interest to the Southwestern Railroad Company on the advance thus made, and if that interest amounts to the stock already issued, to the full amount of $15,000.00 per mile, on twenty-one miles and four hundred and fifty-seven feet, then they would not be entitled to recover. The Railroad Company claims that they were not to issue this stock until the road was completed; but by this subsequent arrangement, they did agree to issue it in advance, and that they issued $290,500.00 worth of stock on the 1st of February, 1872, and that dividends had accrued upon that stock at the time they issued it. They, therefore, say that they are not entitled to that under the contract made with Papot & Co.

If you believe, as I said, that they did make such a contract as that, that Papot & Co. agreed, in consideration that they advanced this stock to them, that they would allow them two months' interest at eight per cent interest, of course that should be deducted from the amount of money which they were entitled to under the contract of November, 1871; and if you find that to be the state of facts, then you would calculate the interest on that amount for two months, and add that to the amount of money or stock that the railroad had paid to Papot & Co. at that time, and see what the difference is between the interest and the stock advanced, and what was due under the original contract. I give you the same charge in relation to the stock advanced on the 1st of April; the same question will control that. See how much they advanced on the 1st of April. They claim it is $20,000.00 and the interest on it. If that is true about the interest, then they are entitled to that interest under the contract, if Papot & Co. agreed to pay them that interest in consideration of the advance.

If, on the other hand, gentlemen of the jury, there was no such contract as that made by Papot & Co., that they did not agree to pay General Holt, or the Southwestern Railroad Company, eight per cent on the advance of this stock, but that the consideration for this advance was the turning over of the road from the Vicksburg and Brunswick Railroad Company to the Southwestern Railroad Company; I say, if that was the consideration, and there was no interest agreed to be paid by them, then I charge you that the interest would not be allowable to the Southwestern Railroad Company. If that was a different contract; for instance, if they said: "You will advance us

this stock, and you want this road, and it is to your interest to have it; if you will advance us this stock, we will turn over this road and our stock;'' and if that was the consideration whereby the Southwestern Railroad Company agreed to turn over this stock, then they would not be entitled to it.

I charge you further, gentlemen of the jury, that whether there was any contract made or not about the rate of interest by Papot & Co. with the Southwestern Railroad Company, the true construction, as I told you before, of the contract of November, 1871, is that they were to have fifteen thousand shares of stock at par value; and if there was nothing said about interest by one party or the other, and Papot & Co. got this stock, and the stock was advanced to Papot & Co. before the completion of the road, and at the time it was advanced, interest had accrued upon it and it was inadvertently paid by the Southwestern Railroad Company, or by mistake, and if there was nothing said about it, then I charge you that in equity the Southwestern Railroad Company would be still entitled to it as a set-off or to recover it back, or, at least, Papot & Co. must account for it to the Southwestern Railroad Company. If they have got par value, $15,-000.00 per mile for twenty-one miles, and the fraction, either in stock or money, that is a full compliance with the contract on the part of the Southwestern Railroad Company.

In this connection, I will charge you that, if you believe from the evidence that Ketchum & Hartridge were the agents of Papot & Co. to receipt for this stock, and to settle with the Southwestern Railroad Company for Papot & Co., then whatever they did in and about the business of their agency, Papot and Co. are bound by it; because wherever a man says to his agent to do a certain thing and gives him power to do it, whatever that agent does within the scope of his appointment the principal is bound by it. But if, on the other hand, the agent transcends his authority, the principal is not bound by his acts. Therefore, if you should believe that Ketchum & Hartridge were only agents to receive this stock, and had nothing to do but receive it from the Southwestern Railroad Company, that is all they could do. But if they had a general agency to settle with these people, representing Papot & Co. generally in reference to this stock, then Papot & Co. are bound by whatever they did.

Upon this point, that is the first defence set up by the Southwestern Railroad. In order to determine the truth of this question, you must apply the evidence to these principles of law which I have laid down. Look to all the evidence in the case and determine from that, first, whether there was any agreement made between General Holt, president of the Southwestern Railroad Company, and Papot, that, in consideration of this early advance of the stock, Papot would pay eight per cent interest on the advance. If you find that was the contract, then, as I said before, the railroad would be entitled to that.

Look to the evidence upon that point, both for the complainant and for the defendant. You may look to the letters which have been read before you, the testimony of General Holt, testimony of Mr. Papot, and all the other testimony, and determine from all the evidence whether there was such a contract made or not. You may also look to the evidence, if there was any, on the contract to pay eight per cent interest, and whether General Holt had any consideration moving towards him to make this early advance, and if so, was that consideration the fact that Papot & Co. agreed to turn over their four thousand four hundred shares of the Vicksburg and Brunswick Railroad; was that the consideration which moved General Holt to make the early advance of this stock? If that was the consideration, as I have said before, and there was no consideration about the eight per cent interest, and General Holt agreed to that in order to get possession of the road, and that was the thing that moved him to do it, then, of course, he would not be entitled to eight per cent interest. If neither one of these theories are true, you may look to the other, which I have advanced to you; that is, that they were entitled to one hundred and fifty shares of stock for each mile finished, at par value, and there was nothing said about interest, or there was no consideration about turning over the road. Still, if the Railroad Company, by mistake or inadvertence, or through a misapprehension, paid Papot this stock, with the accrued interest on it, they would still be entitled to have an account from Papot & Co. for their interest. I will charge you further upon that point, that if there was nothing said about that, whether they were to receive the accrued interest, or to account for it or not, but if General Holt paid it with the understanding on his part that he was to get the interest back, although Papot may not have said anything about it, if he paid it through any misunderstanding of that sort, then, in equity, Papot & Co. must account for it. That brings us then to the next defence.

Now, suppose the jury should find against the railroad on the interest question, and find they are still due the forty-six shares, as far as the interest question is concerned, then you would go to the next proposition. Or if you should find in favor of the railroad upon this question, then you need not consider the next proposition.

That proposition is, that the Central Railroad, being the lessor of the Southwestern Railroad, that is to say, that they made the contract with Papot & Co. upon the distinct understanding that they were to get four thousand four hundred shares of the stock, and that it was to be a controlling interest, and that Papot & Co. assured them that there were no debts, liens or liabilities upon it, and they bought it with that distinct understanding, that they would get a road free from all encumbrances and debts, and it turned out there were thirty-two thousand dollars endorsements of Barbour county bonds which were afterwards sued to judgment, and the railroad sold under them.

They say, therefore, that the representations made by Papot & Co. deceived them and defrauded them, because they say they would not have made that contract with this amount of debts-hanging over the road. In other words, the road proved worthless to them. Well, if that defence is true, Papot would not be entitled to recover. I will read you certain sections of the Code. Section 2635.

Either one of those four things amount, in law, to a fraud; not moral, but legal fraud. Therefore, if you believe from the evidence that the Central Railroad agreed to purchase the Vicksburg and Brunswick Railroad for the sole purpose of being able to control it, and run it in connection with the Southwestern Railroad, and that they thought at the time that they were buying it free from debts, upon the assurance which they say Papot had given them; and if you believe, further, that they asked Papot whether there were any debts or liabilities on that road, and he told them that there were none, or if he evaded the truth when asked about that, of course Papot would not be entitled to recover, and you would be authorized to find for the railroad. Or if Papot knew at the time the purpose with which they were buying this road; that they thought they were getting it free of all debts, and kept his peace and said nothing about it, and did not inform them about it, why, then he would not be entitled to recover, and you would be authorized to find for the railroad on that theory. For instance: If you go to buy a piece of property from a man, and you want that property to be put to a certain use, and he knows you want it for that use, and you ask him about it, and he fails to tell you whether there is any defect in it or not, or conceals from you any defect in it, and he knows that you think it is a perfect piece of property, and you buy it, and it turns out to be worthless, then he cannot recover from you.

Read sections 2654, 3173, 3175, 3177 of Code.

Those are the rules of law which I give you upon this second theory of the defence. If you believe, from the testimony in the case, that at the time this contract was made with Papot & Co., he was asked as to the debts and liabilities of this road, and you believe that Papot & Co. assured Wadley or Holt, or the officers of the Central Railroad Company, that there were no debts or liabilities upon the road, and you believe, further, that they bought it for the purpose of controlling it and using it as their property, and you should find, from the evidence, that at the time they made this contract, there were debts and liabilities, and those debts were sued, and that, subsequently, the road was sold under the judgments obtained on those debts, then I charge you, you would be authorized to find for the defendant. Or if you believe, further, that Papot knew that Wadley and Holt were buying this road for the purpose of controlling it and running it in connection with their railroad, and he knew that they were under the impression that there were no debts or liabilities against it,

and he failed to disclose that there were debts and liabilities, then I charge you that you would be authorized to find for the defendant, and against Papot. But if, on the other hand, you believe, from the evidence, that at the time Wadley made the purchase (I say Wadley for the Central Railroad), he had been informed that there were debts and liabilities against the railroad; that they had endorsed these bonds for Barbour county, and he bought with that knowledge, then I charge you, you would be authorized to find for Papot, and against the railroad, on that issue. Or if you believe, from the evidence, that Wadley did not take Papot's word for it, but he sent his counsel there to look into the matter, and that counsel reported to him that there were debts or liabilities, and he bought with that understanding; or if you believe that, not relying on Papot's sayings, he relied on the sayings of his counsel, leaving Papot entirely out, and he bought, and there were debts, then you would be authorized to find for Papot, and against the railroad. If you believe, from the evidence, that Wadley sent his counsel there, and that counsel made all the investigation that was possible to make, and he reported that there were no debts or liabilities to which the road was subject, and Wadley bought on that report, and Papot & Co. knew at the time there were debts and liabilities to which the road was subject: I say, if that is the truth of the case, then Papot cannot recover, and you would be authorized to find for the railroad.

It is claimed, gentlemen of the jury, that one of the attorneys making this investigation was the attorney of the Central Railroad, to-wit, Eli Shorter, and that he knew that these endorsements of the Barbour county bonds had been made by the Vicksburg and Brunswick Railroad Company; therefore, his knowledge, it is claimed by Papot, was the knowledge of the Central Railroad. On that point, I charge you this to be the law: If you believe, from the evidence, that General Lawton and Eli Shorter were attorneys for the Central Railroad, and that they were appointed by Mr. Wadley, or the board of directors, to go and make this investigation, and you believe that Eli Shorter, being appointed specially for that purpose, knew of these endorsements on this road, then his knowledge became the knowledge of the Central Railroad. If he found it out by reason of the fact that he was the appointed lawyer for this special occasion, then whatever he ascertains, whatever came to his knowledge by reason of his employment in that particular business, was the knowledge of the Central Railroad. But, on the other hand, if you should find that, although Eli Shorter was general counsel for the Central Railroad in Eufaula, and at the same time was president of the Vicksburg and Brunswick Railroad Company, and as president of the Railroad Company, he had the knowledge that these bonds had been endorsed, and he did not gain that knowledge as attorney of the Central Railroad Company, then what knowledge he got as president of the company

was not the knowledge of the Central Railroad Company, and the Central Railroad Company would not be bound by it, although he was their attorney and knew all about the endorsement of the bonds. I say it is claimed that Eli Shorter was general attorney of the Central Railroad in Eufaula, and it is claimed that he was president of the Vicksburg and Brunswick Railroad Company at the same time. Now, whatever knowledge he had as president of the Vicksburg and Brunswick Railroad Company did not bind the Central Railroad Company if he endorsed these bonds as president for that company; the Central Railroad Company was not bound by it by what he did as president; they are only bound when they employed him to look into it to see whether there were any debts or not, and if he learned, as a lawyer, of these endorsements, he is bound to disclose it to them, and he is bound by what he learned as a lawyer; but if he knew it as president, they are not bound by it. A man may find out a thing as a lawyer, and Mr. Ellis may subsequently employ him about the same thing, and he ain't bound to tell you, and you are not chargeable with his knowledge that he got Mr. Ellis when acting as Mr. Ellis' lawyer. Therefore, if Mr. Eli Shorter was president of this company, and endorsed these bonds, then, if he got his knowledge that way, the Central Railroad is not bound by it.

Look to the evidence and ascertain, first, whether, at the time this trade was made, inquiry was made of Papot about these debts; and while upon the subject of debts, I will charge that, although Barbour county may have issued these bonds, yet if they were endorsed by the Vicksburg and Brunswick Railroad Company, it was a debt of the Railroad Company just as much as it is a debt of Barbour county. In other words, if I make a note and Mr. Ellis endorses it, it is as much à debt of his as mine, and in making up a schedule of his debts, he is bound to put that endorsed note in it, because he is liable just as much as I am. Therefore, if this Vicksburg and Brunswick Railroad Company endorsed these bonds, it was just as much their debt as it was Barbour county's. If Wadley bought this railroad for the purpose which he claims that he bought it, and it was sold under those endorsed bonds, and he lost the use and control of it, then it don't matter, in this litigation, whether he can make it out of Barbour county or not. It is not a question here as to whether he can reimburse himself, but whether the warranty, or implied warranty, of Papot & Co. failed, whether he has lost the use and control of the railroad. Examine the evidence to see whether inquiries were made of Papot about the debts and liabilities of this railroad, and ascertain whether he said there are any debts or not from the evidence; or if you find that he made no representations at all, ascertain what purpose Wadley had in buying this road, and if Papot knew his purpose; find if he knew that Wadley thought it free from debts and encumbrance, and whether he was asked about it or not, and if he remained

silent, he cannot recover, because he is bound to disclose it if he knew that was what Wadley was purchasing it for.

Now, the rule of law, gentlemen of the jury, is, that if the evidence is conflicting on this or any other point; if one man swears that he made certain inquiries, and the other says he did not, and the evidence is conflicting, the law says you must reconcile it if you can, so as to make it harmonize, and make each witness speak the truth; but if you cannot do that, you must look to the witnesses, their manner of testifying on the stand, the interest they have in the case, the bias or prejudice which they exhibit, if they show any, the means of knowing what they are testifying about, their recollection, the time that elapses, and all that sort of things, and you will give credit to that witness, or those witnesses, whom you think best entitled to it under all the facts disclosed in the evidence. Therefore, if this testimony is conflicting, and you cannot reconcile it, then you can look to all these circumstances as to which witness you will believe, and believe that one who is entitled to it from all the circumstances. That is true not only of this issue, but of the next issue also.

The complainant claims forty-six shares, at the par value of $4,600, and if you should find for complainant, then he would be entitled to interest on those shares from the time they ought to have been paid at the completion of the road, and you will say what the interest of the stock was at that time, and what it has borne since, and if you find the forty-six shares, of par value of $4,600.00, you will calculate the interest on $4,600.00 from the time it ought to have been paid up to the present, and your verdict in that case would be: We, the jury, find for complainant $4,600.00, with interest at such a rate per cent from a certain time.  But, on the other hand, if you should find that the railroad has fully paid them, either in stock, or interest on stock, under the rules of law I have given you, and you find that Papot & Co. have the full number of shares, by money or interest, then your verdict would be: We, the jury, find for the defendant; or if you should find against the railroad, on the interest question, examine the representations made by Papot, as to whether he disclosed certain things; and if you find in favor of the railroad on that question, your verdict would be: We, the jury, find for the defendant.

You can retire to your room, gentlemen.

LANIER & ANDERSON; GUSTIN & HALL, for plaintiff in error.

R. F. LYON; A. R. LAWTON, for defendants.

JACKSON, Chief Justice.

This case has been three times before the superior court

of the county of Bibb, and three times a verdict for the plaintiff has been returned—twice for the full amount sued for, and the last time for a less sum. Twice before it has been before this court. 59 *Ga.*, 342; 67 *Id.*, 675. On all material issues of law, the questions have been decided by this court, and a new trial was granted the defendants on errors of law alone, and as contrary to one charge of the court, in the opinion in the 67th *Ga.*

On the motion for a new trial from the last verdict, the court below granted it on all the grounds taken in that motion, including the ground that the verdict is contrary to law and evidence, thus necessitating this writ of error at the instance of the plaintiffs, inasmuch as it is not the first grant of a new trial, in which case the discretion of the court to have a new trial on the evidence is rarely disturbed. The questions made on the present assignments of error are, first, was there error material to the real issues on trial in any ruling of the court; and, secondly, is the verdict so strongly and decidedly against the weight of the evidence as to authorize the grant of a new trial this time?

1. The admission of the testimony of Papot in respect to interest accumulated on the shares of the capital stock of the Vicksburg and Brunswick Railroad Company, transferred to the defendants by Shorter, Papot & Co., if objectionable as irrelevant, is not so material as to require a new trial. It rather strikes us, however, as relevant, inasmuch as those shares were the *quid pro quo*—the consideration given by Papot & Co. for the shares of the Southwestern Railroad Company, for a remainder of which, alleged to be due them by the Railroad Company, the suit was brought.

2. There was no error in permitting proof that the Central Railroad Company directed an examination into the status of the Vicksburg and Brunswick Railroad Company in respect to its general condition, indebtedness, etc., inasmuch as one    the issues is that Papot & Co., by fraudulent misrepresentations or suppressions of truth in respect

to its true condition, had defrauded the defendants. Anything tending to show information to defendants, or opportunity to be informed by them about that condition, might, and probably would, throw light on the charge of fraud, and to what extent the defendants were hurt thereby.

3. The pencil memoranda of Virgil Powers at the foot of a letter of Ketchum & Hartridge to Holt, as to what he might report to Ketchum & Hartridge, were ruled out properly, as Papot & Co. knew nothing about them, nor did Ketchum & Hartridge. What was reported to them, if material, was the thing admissible. Besides, if admitted, the memoranda amounted to nothing. " You may say I have the matter under investigation, and will report amount due as soon as practicable," and " Please return to me with my answer per K. & H. Have directed J. M. Waldron, road master, to make return to me of the cost of completing the work left unfinished ; when he reports, I will give you statement of settlement," are the memoranda, and their admission or rejection could have little bearing on the issues in the case.

4. The record of the marshal's deed, recorded in Alabama, is not proof of the deed in the courts of this state, so as to admit the deed in evidence without proof of execution. *Baskin vs. Vernon*, this term.

5. The fifth ground is that the court erred in charging the jury, " If, on the other hand, there was no such contract as that made by Papot & Co., that they did not agree to pay General Holt, or the Southwestern Railroad Company, eight per cent on the advance of their stock, but that the consideration for this advance was the turning over of the road from the Vicksburg and Brunswick Railroad Company to the Southwestern Railroad Company,—I say, if that was the consideration, and there was no interest agreed upon to be paid by them, then I charge interest would not be allowable to the Southwestern Railroad Company. If that was a different contract—for instance, if they said, ' You will advance us this stock, and you

want this road, and it is to your interest to have it, if you will advance us this stock, we will turn over this road and our stock;' and if that was the consideration whereby the Southwestern Railroad Company agreed to turn over this stock, then they would not be entitled to it."

We are unable to see error in this charge, read in connection with the charge in full, which is reported at the head of this opinion.

6. The sixth ground is, because the court erred in charging the jury, " But if, on the other hand, you believe from the evidence that, at the time Wadley made this purchase (I say Wadley for the Central Railroad), he had been informed that there were debts and liabilities against the railroad, and that they had indorsed these bonds for Barbour county, and he bought with that knowledge, then I charge you, you would be authorized to find for Papot, and against the railroad, on that issue."

Read in the connection with the full charge, there is no error in this extract.

7. The seventh ground is, the court erred in further charging the jury, " Or if you believe from the evidence that Wadley did not take Papot's word for it, but sent his counsel there to look into this matter, and that counsel reported to him there were no debts or liabilities, and he bought with that understanding; or if you believe that, not relying on Papot's sayings, he relied on the sayings of his counsel, leaving Papot entirely out, and he bought, and there were debts, then you would be authorized to find for Papot, and against the railroad."

The above, considered alone, and as written in the ground of the motion, would be error, because it would impress the jury that, if the counsel reported that there were *no* debts or liabilities, and the railroad company relied on their report of what turned out to be false, though Papot, who knew better, represented the same thing, yet the company would be bound by the misinformation of their counsel, as between itself and Papot, when Papot

had confirmed its belief of a lie by vouching for it as the
truth. But the record is confused in respect to what this
charge really was. The motion for a new trial makes it
as above written, but the charge itself leaves out the little
word " no," which I have italicized, and makes the charge
read thus: " Or if you believe from the evidence that
Wadley did not take Papot's word for it, but sent his
counsel there to look into this matter, and that counsel re-
ported to him there were debts or liabilities, and he bought
with that understanding, or if you believe that, not rely-
ing on Papot's sayings, he relied on the sayings of his
counsel, leaving Papot entirely out, and he bought, and
there were debts, then you would be authorized to find
for Papot, and against the railroad." And the next para-
graph of the charge explains the meaning beyond all cavil.
It is as follows: " If you believe from the evidence that
Wadley sent his counsel there, and that counsel made
all the investigation that was possible to make, and he
reported that there were *no* debts or liabilities to which
the road was subject, and Wadley bought on that report,
and Papot & Co. knew at the time that there were debts
and liabilities to which the road was subject—I say, if that
is the truth of the case, then Papot cannot recover, and
you would be authorized to find for the railroad." The
meaning of which, taken together, we take to be that, if
Papot made no representations and suppressed no facts
which tended to induce Wadley to make the contract, and
Wadley acted entirely free from any such fraud, open or
concealed, on the part of Papot, then Papot might recover;
but if he was influenced by the conduct of Papot, or any of
his company, to believe that the Vicksburg and Brunswick
Co. was not in debt, when he knew it was, then he could
not recover. So, construing the whole of the charge on
this subject, which is further expanded and explained in
the full charge, we are unable to see the error therein. It
excludes Papot from recovering, no matter what Wadley's
counsel reported, if Papot's skirts were unclean in the

transaction; but if Wadley acted on the investigation and report of his own counsel, unaffected by any falsehood, direct or indirect, by Papot, etc., then Papot might recover.

8. The 8th ground is as follows: Because the court erred in charging: " It is claimed that one of the attorneys making this investigation was the attorney of the Central Railroad, to-wit, Eli Shorter, and that he knew that the indorsement of the Barbour county bonds had been made by the Vicksburg and Brunswick Railroad Company. Therefore, his knowledge, it is claimed by Papot, was the knowledge of the Central Railroad. On that point, I charge this to be the law: If you believe from the evidence that General Lawton and Eli Shorter were attorneys for the Central Railroad, and that they were appointed by Mr. Wadley, or the board of directors, to go and make this investigation, and you believe that Eli Shorter, being appointed specially for this purpose, knew of these indorsements on this road, then his knowledge became the knowledge of the Central Railroad; if he found it out by reason of the fact that he was the appointed lawyer for this special occasion, then whatever he ascertained, whatever came to his knowledge by reason of his employment in that particular business, was the knowledge of the Central Railroad; but, on the other hand, if you should find that, although Eli Shorter was general counsel for the Central Railroad in Eufaula, and at the same time was president of the Vicksburg and Brunswick Railroad Company, and as president of the Railroad Company, he had the knowledge that these bonds had been endorsed, and he did not gain that knowledge as the attorney of the Central Railroad Company, then what knowledge he got as president of the company was not the knowledge of the Central Railroad Company, and the Central Railroad could not be bound by it, although he was their attorney, and knew all about the indorsement of the bonds."

The principle here laid down is, that knowledge of the

agent about business entrusted to him by the principal, acquired by reason of that employment, is knowledge of the principal; but if he was also at the same time an officer of the company about whose condition he was employed to make inquiry, and knew its condition from that official character, then his knowledge was not the knowledge of the company;—the effect of which charge was to exclude the idea altogether that Shorter's knowledge at all affected the Central Railroad Company; and we do not see how the charge could have affected disastrously the Railroad Company. Shorter must have known the condition of the company by reason of his office as its president, and not from discovery made by his agency as special attorney for the Central Railroad. The charge had better have been that, if Shorter was president of the Vicksburg and Brunswick Railroad, and also in the employment of the company defendant here, then the company would not be affected at all by what he knew as president, and must have known in that character, which would have been plainer; but as it is, with a jury of ordinary capacity, it meant that, and did no harm to defendant in error. The restriction hurt the other side.

9. The next ground we consider is the refusal to charge as follows: " If, upon the rules of law I have stated, you find that Papot, to induce the trade, made representations to the defendants, on which they acted, and which were not true, then the complainant is not entitled to recover in this case, nor will the complainant be relieved from the effects of his misrepresentations or suppression of the truth; that is, if you believe from the evidence that he was guilty of any, although another person, who was the attorney of one of the companies, was guilty of a like misrepresentation or suppression of the truth."

We think that this request is law, and law applicable to the case, and that the refusal to give it would require a new trial, unless covered by the general charge. The whole tenor, however, of the general charge seems to us

to cover substantially the request asked. It absolutely shuts the door upon Papot, unless he was clean; and he could not be clean if he had misrepresented or suppressed the truth, no matter what anybody else, attorney or not, agent or not, did or said.

10. The next ground is also a request to charge, which was refused It is : "If the defendants made this contract with Shorter, Papot & Co. for the purpose of obtaining the use and control of the railroad and its property from Eufaula to Clayton, Alabama, and paid the full and fair value for such property, or agreed to do so, and they have lost the expected benefits of such contract by reason of outstanding debts against said property at that time, of which they were ignorant, then, under the law, the complainant cannot recover in this case, even if the jury should believe any part of the consideration agreed to be given has not been paid."

It seems to us that the above request is too broad. Papot & Co. must have participated directly or indirectly in causing this ignorance on the part of the Central Railroad to block all recovery. The defendants in error may have made the contract for that purpose, and plaintiffs may not have known the purpose they had in view. If so, it was not their contract. It was an exchange of stock for stock, to get control of the road, it is true, but whether to get it out of debt or not is another question. They got the stock and the control and possession, but encumbered with debt.

11. This brings us to the consideration of the last point, that the verdict is contrary to the great weight of the evidence, and therefore to law and equity. There were but two issues for the jury : First, was the Central Railroad entitled to interest on the advanced stock turned over to Papot & Co.; and, secondly, did Papot & Co. bring about the trade by fraud in misrepresenting or concealing the true condition of the road, whose stock that company exchanged for Southwestern Railroad stock? Both issues

have been decided by three juries, and the verdict should stand, if there be evidence to support it, and no material error committed by the judge.    We have passed upon the alleged errors of the court on the trial ; how is it as to the jury on the facts ?

On the first issue, in respect to the interest, the evidence is somewhat conflicting, yet there is enough to sustain the position that there was no agreement by Papot & Co. to pay interest on the advanced stock, but that they desired to get hold of the stock to stop interest they were then paying.    It seems unreasonable that they should bargain to pay interest upon stock which was to be used to stop interest which they were paying.    And the fact that the road was completed sufficiently to transport freight, and that, therefore, the Central Railroad Co. wished to get its use in the "cream" of the freight business, and on that account went into possession before its perfect completion, and advanced the transfer of stocks on that account, as contended by Papot, and that this was the real consideration which moved the parties to change the date of the exchange of the stocks and the possession of the road, seems also reasonable.    Combining the two, to-wit, that the one party wanted possession, and the other to stop paying interest, and a logical conclusion might well be reached that Papot's contention is based on truth.    If so, inasmuch as a verdict is but the truth told by the jury, should it not stand on the interest issue ?

On the second issue, the verdict is as fully sustained.    If Hartridge is to be believed, Wadley was informed of this indebtedness, and so was the cashier of the Railroad Company.    If so, the ground-floor of the railroad's position sinks. It bought with knowledge of the indebtedness of the Brunswick Road's stock, and exchanged Southwestern stock for it, knowing that indebtedness.    If Hartridge was mistaken, and these officers did not hear what was said by him, the evidence of fraud or no fraud on the part of Papot & Co., a peculiar question for the jury, is, to say the least,

conflicting, and rather preponderates for the verdict. Papot himself swears positively, denying any representation or concealment about it, and the testimony of the witnesses for the defendants is not positive in contradiction of his statement and denial. It is an issue of fraud or no fraud, especially a jury issue, and, on conflicting testimony, one verdict should not be hastily disturbed. Three verdicts— at least two on this particular issue of fraud—should be allowed to stand, unless facts were grossly set at defiance and ruthlessly disregarded by the juries. This is not such a case. 4 *Ga.*, 170: 59 *Ib.*. 111. It is true that those cases were affirmances of judgments, and the presiding judge had approved the finding, but on issues of fraud, repeatedly decided by the jury, the presiding judge should not interfere, unless the verdict on the point is clearly and manifestly wrong. The defendants in error got the stock which enabled them to control the road, it being the majority of it, and for the balance, they paid not more than its value (judging by what they gave for the majority when they had to buy the road to extinguish the debt). Besides, it would seem they have redress upon Barbour county, Alabama.

Upon the whole, we do not clearly see how the defendants in error were damaged, and conclude that the verdict ought to stand.

Judgment reversed.